CASE 46.—ACTION BY CHARLES M. LANCASTER'S ADMIN-
ISTRATOR AGAINST THE CENTRAL CITY LIGHT
& POWER COMPANY.—March 2, 1910.

## Lancaster's Admr v. Central City Light & Power Co.

Appeal from Muhlenberg Circuit Court.

W. P. Sandidge, Circuit Judge.

Judgment for defendant, plaintiff appeals.—Affirmed.

1. Master and Servant—Safe Places and Appliances—Care Required.—All that the master is required to do is to furnish reasonably safe places and appliances and this degree of care does not demand that he should furnish the very latest and best improvements, and it will be sufficient if these furnished are in general use and generally regarded as reasonably safe.

2. Master and Servant—Safe Appliances—Electrical Machinery. The rule that a master need not furnish the latest and most improved appliances, if those used are reasonably safe, applies to electrical machinery, and the fact that electricity is a dangerous agency does not alter the rule.

3. Master and Servant—Contributory Negligence—Electrical Machinery.—Where an experienced electrician, in sole charge of an electric light plant, knows that the only safe way to turn off arc lights is to draw out two plugs in the

switchboard, one at a time, and that if he drew out two plugs at once it would be safe if he kept his hand off the uninsulated part, his act in taking both plugs out at once, and permitting his fingers to come in contact with the uninsulated part, whereby he was killed, is negligence barring recovery.

B. F. PROCTOR, G. H. HERDMAN, L. C. JONES and GREENE VAN WINKLE & SCHOOLFIELD, for appellant.

R. Y. THOMAS, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

Charles Lancaster, at the time of his death, which was caused by an electric shock, was electrician and in sole charge of the Central City Light & Power Company's plant. He had been working in this capacity for about six weeks before his death, and had previously had several years' experience with other but smaller electric plants. It may therefore be said that he was experienced, and fully acquainted with the dangers and risks of his employment. In connection with the plant, there was what is called a "switch board." The street or arc lights were turned off by pulling two plugs out of the switch board, which connected in the back end thereof in such a manner as either to turn on or off the electricity. These plugs were about ten inches in length, and ran into sockets in the switch board, and each of them had a rubber handle about five inches long and perfectly insulated. When it was desired to turn the lights on, these plugs were pushed into the sockets; and, when it was desired to put the lights out, the plugs were pulled out. The evidence very clearly established that the proper way in which to turn the lights off was to pull out one of these plugs at a time, and that if this method was observed there was no danger. The evidence

also established that even if both of them were pulled out at the same time, as they might be by taking hold of the insulated handle of each, there would be no danger, unless some part of the hand came in contact with the plugs before they were entirely pulled out, and beyond the point at which they were insulated. It is also clearly shown that Lancaster knew that the proper method of cutting off the lights was to pull one of these plugs out at a time, and that he also knew that it was dangerous to attempt to pull both of them out at the same time. And, being the electrician in charge, he knew that if his hand or fingers touched the uninsulated part of these plugs before they were pulled out that death would surely result. It may also be said that there is no serious contradiction in the evidence that the method of pulling these plugs out was very simple and entirely safe if the slightest care was exercised by the operator to prevent his fingers or hands coming in contact with the uninsulated part of the plug, which it was not necessary in any state of case to touch in order to pull the plugs out. It appears that Lancaster, in attempting to shut off the lights, pulled both of these plugs out at the same time, and in some manner permitted one finger on each hand to come in contact with the uninsulated part of the plugs. The result was instant death. To recover damages for the loss of his life, this action was instituted by his administrator. Upon a trial before a jury, a verdict was returned in favor of the electric light company, and this appeal is prosecuted by the administrator.

Two grounds of negligence are alleged, but one of them has been abandoned, as the evidence did not justify the charge. The negligence here insisted on is that the switch board was defectively constructed

and defectively and dangerously wired. Upon this point W. H. Isbell, a practical electrician, testified that the switch board was so constructed that the plugs had to be entirely withdrawn before the electric current was shut off or disconnected, when it should have been so constructed as that if the plugs were moved three-fourths of an inch it would disconnect the current. This witness also said that the handles on these plugs were perfectly insulated, and that the only way a person in pulling them out could come in contact with the electricity was by putting the fingers of his hands over the handle on the metal. Other electricians testified that the switch board, and the arrangement of the plugs, was constructed on the most approved plan.

Passing, for the moment, the question of a peremptory instruction, that it is insisted by counsel for the appellee should have been given, we will examine the instruction complained of. The court, in substance, instructed the jury that if they believed from the evidence that the defendant company negligently furnished its plant with a switch board which was at the time defectively or improperly wired, or that the plugs furnished were defectively or improperly insulated, and that by reason of such defective or improper wiring, if any, or such defective or improper insulation, if any, the switch board was not a reasonably safe appliance, and by reason of the negligence in these respects, or either of them, plaintiff came to his death, they should find for the plaintiff, unless they believed that his death was caused by his contributory negligence.

The only negligence complained of, or concerning which there is any evidence, is that the switch board was not properly constructed; and, as upon this point

the evidence for the company showed that the switch board was safe and perfectly constructed, it will be seen that the question comes down to whether or not the plan upon which the switch board was constructed was reasonably safe. It seems that there are different types of switch boards, and, although all of them are in general use and regarded as being properly constructed, there is yet difference of opinion as to which one is the safest. This being so, it is not so much a question here of unsafe appliances, as it is a question of what appliances are the safest. Isbell, the electrician who testified for the appellant, thought the switch board he described the safest, while Willard, the electrician who testified for the appellee, considered the one in use by the appellee company the safest. In cases like this, we have frequently announced that all the master is required to do is to furnish reasonably safe places and appliances, and that this degree of care does not demand that he should furnish the very latest and best improvements. It will be sufficient if those furnished are in general use and generally regarded as reasonably safe. Dow Wire Works Co. v. Morgan, 96 S. W. 530, 29 Ky. Law Rep. 854; Louisville & Atlantic R. Co. v. Wilson, 99 S. W. 634, 30 Ky. Law Rep. 734; New Galt House Co. v. Chapman, 124 Ky. 527, 99 S. W. 632, 30 Ky. Law Rep. 692. And there does not seem to be any reason why this rule should not be applied to electrical appliances. All that the master should be required to do in any kind of business is to furnish appliances that are in general use and generally regarded as being properly and safely constructed.

We do not well see how he could reasonably be expected to do more than this. The fact that electricity is a dangerous and deadly agency should not be al-

lowed to alter this rule. It is an agency in general and practical use, and when a person who desires to install an electric plant procures appliances and fixtures that are constructed on safe and approved plans, and maintains them in good repair and in the same condition as when he installs them, he has discharged as far as he should be required to do his duty in this respect towards all persons, whether employes or not. It is not possible to so construct electrical appliances as that they will not be dangerous to persons operating them, who fail to exercise ordinary care for their own safety and protection. To lay down a rule that the master must have his appliances so constructed as that a careless or inattentive operator would not be in peril would be to impose upon the master conditions that could not in any state of case be complied with. In almost every business in which machinery is used, there is danger attending its operation. No machinery operated by steam or electricity is safe in the sense that an operator cannot be injured by it. No amount of care on the part of the master in equipping his plant with safety appliances will afford perfect immunity from injury to careless or inattentive operators. And so when the master has provided for the use of his servant machinery and appliances that are reasonably safe, and the servant by reason of his age and experience is capable of understanding and appreciating the danger that will follow careless methods, he must, if injured, take the consequences of his act.

For these reasons we think the instruction given correctly laid down the law applicable to this case, as the only question at issue was the construction of the switch board. Of course, this rule only applies to the construction of appliances, and not to appli-

ances that have been permitted to become defective or unsafe. If an appliance or fixture used in connection with electricity was for any reason permitted to become defective or unsafe, we would apply the rule announced in Overall v. Louisville Electric L. Co., 47 S. W. 442, 20 Ky. Law Rep. 759; McLaughlin v. Louisville El. L. Co., 100 Ky. 173, 37 S. W. 851, 18 Ky. Law Rep. 693, 34 L. R. A 812; Macon v. Paducah St. Ry. Co., 110 Ky. 680, 62 S. W. 496, 23 Ky. Law Rep. 46; Lewis v. Bowling Green Gas L. Co., 117 S. W. 278, 22 L. R. A. (N. S.) 1169—imposing upon the master the utmost degree of care to keep the place and appliance safe. And we also hold that this rule should be applied as between master and servant, as it is just as important that servants who are employed about electrical machinery should have the same measure of protection as any other person who may come in contact with it. Mangan v. Louisville El. L. Co., 122 Ky. 476, 91 S. W. 703, 29 Ky. Law Rep. 38, 6 L. R. A. (N. S.) 459.

But, in addition to this, we are of the opinion that the court should have directed the jury to return a verdict for the appellee company, as the death of Lancaster was due solely to his failure to exercise ordinary or even slight care for his own safety. The rubber handles on these plugs, that were perfectly insulated, were five or six inches long, affording ample room to take hold of them and remove them from the sockets, and there was absolutely no danger in removing them, unless it was attempted to remove both of them at one time, and the finger or hand was permitted to come in contact with the uninsulated part of the plug. The evidence established beyond doubt that Lancaster knew full well that it was improper and dangerous to attempt to pull out both of these

plugs at the same time, and furthermore knew that the proper way was to remove one of them at a time, and that there was no danger in doing this. There is no explanation whatever of the conduct of Lancaster in attempting to remove both of the plugs at the same time, nor is any reason or excuse suggested by counsel why he did so. Under the evidence, the jury could not have reached any other conclusion than the one they did.

Wherefore the judgment is affirmed.